UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                      :

FORMULATED SOLUTIONS, LLC and        :
SUPER-TEK PRODUCTS, INC.,               :        **MEMORANDUM & ORDER**

                         Plaintiffs,        :        02-CV-6490 (DLI)(RLM)

             -against-                         :

CKD, INC., THOMAS DESIMONE and     :
DESIMONE ASSOCIATES, INC.,           :

                         Defendants.      :
-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

      The action before the court involves allegations that defendants engaged in an "unlawful plan" to steal a customer from the plaintiffs. Plaintiffs allege product disparagement and fraud under New York common law. For the reasons set forth below, defendants' summary judgment motion is granted on all claims.

**I.     Facts**

      Plaintiff Super-Tek Products, Inc. ("Super-Tek") manufactures a line of grouts for tile applications and, in the early 1980s, expanded its product line by offering a mastic adhesive product called XT-2000. This mastic adhesive is used to bond rigid plastic wall covering to walls. Prior to 2001, XT-2000 was the only mastic adhesive (as opposed to a contact adhesive) on the market that was specifically designed for this use. Plaintiff Formulated Solutions, LLC ("Formulated Solutions") performs marketing functions for Super-Tek. Defendant, CKD, Inc. ("CKD") is

1

involved in the business of distributing and marketing adhesive products. CKD began distributing a mastic adhesive named HI-STIK in 2001. Defendant Thomas E. DeSimone is the president of defendant DeSimone Associates, Inc. ("Associates") and a former sales representative with plaintiff Super-Tek.

Super-Tek was not originally involved in the manufacture of mastic adhesives for bonding rigid plastic wall covering, but rather was a grout manufacturing company. When Super-Tek hired defendant Thomas DeSimone, he brought with him his knowledge of adhesives gained from working at Rohm & Haas, a resin manufacturing company. DeSimone became Super-Tek's exclusive sales representative for the promotion and sale of XT-2000. During his employment with Super-Tek, DeSimone did not have a confidentiality agreement with Super-Tek, nor was he covered by a non-compete agreement. Furthermore, XT-2000 is not covered by a patent nor are its installation instructions copyrighted. Super-Tek terminated DeSimone in 1999, following disagreements over his rate of commission.[1]

Mastic adhesives are more user-friendly than contact cement because they allow the installer to reposition the sheet. However, when XT-2000 is exposed to cold temperatures, it is not freeze thaw stable, meaning that the adhesive does not retain its stickiness once the product freezes and re-thaws; therefore, if the adhesive freezes, it can be difficult to apply. To remedy this problem during the winter, Super-Tek shipped XT-2000 in heated vehicles.

DeSimone contacted Henkel Adhesives ("Henkel") after he had been terminated from Super-Tek to discuss development of a freeze stable mastic adhesive. DeSimone provided Henkel with a

---

[1] Later that year, DeSimone commenced litigation in the New York Supreme Court, Queens County, against Super-Tek, claiming that he had been wrongfully terminated. This lawsuit was dismissed in 2002. The dismissal was affirmed by the Appellate Division, Second Department. *DeSimone v. Supertek, Inc.,* 764 N.Y.S.2d 846 (2d Dep't 2003).

sample of XT-2000, which was readily available on the market. Henkel developed a new product called HI-STIK Advantage 99 ("HI-STIK 99"). Through his contacts with Henkel, DeSimone was introduced to defendant CKD, an adhesive product distributor and marketing company, which agreed to distribute the new adhesive.

DeSimone contacted Matthew Bennett, the vice-president for product development at Inpro. At the time DeSimone contacted Bennett, Inpro had been purchasing XT-2000 from Super-Tek. DeSimone told Bennett that he was no longer working with Super-Tek and that he was calling to discuss whether Inpro would be interested in purchasing a freeze thaw stable adhesive that was currently under development. Bennett affirmed that Inpro would be interested in such a product, and DeSimone provided Bennett with a sample of HI-STIK 99. Bennett subjected the adhesive to internal testing at Inpro and discovered that the product failed to meet Class A fire rating requirements. As a result, Henkel reformulated the adhesive and developed a new product, which was labeled "HI-STIK." Bennett confirmed that the new formulation could pass Class A fire ratings. Henkel then received UL (Underwriters Laboratory) approval for HI-STIK, which must be obtained prior to introducing an adhesive to the market and entails flame spread and smoke generation testing.

Henkel performed a series of tests on both HI-STIK and XT-2000 to test the performance of each adhesive. Although the products are designed to be used with rigid plastic wall coverings, Henkel's testing was performed on a metal substrate. Drew Carlson, president of CKD, testified that Henkel used this medium for the testing because, unlike wood or plastic, "[s]tainless steel isn't going to change," so "you can repeat [the] tests." (Carlson Dep. at 201.) In contrast, "plastic is different from plastic to plastic" and "wood to wood . . . is going to be different, based on moisture content, based on humidity." (*Id*. at 199.) Carlson testified that if Henkel had used one of these other

3

substrates, the laboratory would not have been "assured of the results" of the testing. (*Id*.) Defendants support Henkel's testing methods, arguing that methods such as ASTM-D 3330 suggest that an adhesive substance should be compared by measuring only its physical characteristics rather than those of the substrate. Plaintiffs contend that Henkel's method of testing was improper since it did not involve the intended industrial application for the adhesives (i.e., bonding rigid vinyl wallcovering to wallboard/plasterboard substrates).

As part of defendants' marketing strategy of the new HI-STIK adhesive, defendants created a packet of information for potential customers, which included a letter, installation instructions, pricing, and an unsigned report containing the Henkel test results. Defendants sent this packet to Inpro with a cover letter dated August 21, 2001. The August 21, 2001 cover letter contained in the packet made several comparisons between HI-STIK and XT-2000. Specifically, the letter stated the following in bullet-point format: (1) HI-STIK is freeze thaw stable and XT-2000 is not, so HI-STIK "provides the freedom to ship at will all year round"; (2) HI-STIK "will adhere PVC wallcovering to ALL substrates"; (3) HI-STIK is three to five times stronger than XT-2000, "allowing for fewer delamination problems"; (4) HI-STIK is "easier to spread" than XT-2000, "assuring more complete adhesion and less troweling time"; (5) HI-STIK "will withstand prolonged temperatures up to 170 [degrees Fahrenheit] without allowing the wallcovering to move or bubble"; and (6) HI-STIK "contains special biocides to retard growth of bacteria and provide longer shelf life." (Carlson Aff. Ex. D.) Plaintiffs allege that bullet points 1, 3, and 4 in the defendants' letter are misrepresentations.

Because Inpro had an ongoing relationship with Super-Tek, Steven Ziegler, the president of Inpro, sent a copy of the August 21, 2001 letter to Super-Tek. Ziegler testified at his deposition that he sent the letter to Super-Tek to find out whether Super-Tek had a freeze stable adhesive that would

4

be able to compete with HI-STIK. Aside from the freeze stability issues with XT-2000, Ziegler testified that he was satisfied with the performance of XT-2000 and did not want to change suppliers if Super-Tek had a similar product available.

Garuti testified that he "knew immediately, upon reading the literature [comparing XT-2000 and HI-STIK], that it was fraudulent." (Garuti Dep. at 32.) Garuti admitted that XT-2000 was not freeze thaw stable but contested any implication that XT-2000 was not shippable in winter. Garuti also challenged the assertion that HI-STIK was stronger than XT-2000 based on a lack of delamination problems with XT-2000 and because customers relied upon XT-2000 adhering to wall covering. (*Id*. at 59.) Super-Tek responded by attempting to reconfigure XT-2000 to make it freeze thaw stable. To this end, Super-Tek contacted Air Products and Chemicals, Inc. ("Air Products"), a potential supplier of resin for the contemplated freeze thaw stable version of XT-2000. Super-Tek asked Air Products to compare HI-STIK to XT-2000 and provided Air Products with instructions and samples of HI-STIK to use in the testing.

Following the development of its new product with Air Products, Super-Tek presented XT-2000+, a reformulated version of XT-2000, to Inpro. However, Matthew Bennett, Inpro's vice-president for product development, testified that the reason why Inpro was not interested in purchasing XT-2000+ was that the new product had not undergone the requisite UL testing and approval process. (Bennett Dep. at 72.) Since the original formulation of XT-2000 was not freeze thaw stable, Inpro contacted Super-Tek to obtain a lower price. Inpro continued to purchase XT-2000 at this lower price, but its orders began to recede in 2002 before it eventually stopped ordering XT-2000, due to lack of customer demand.

Bennett testified that the primary reason Inpro selected HI-STIK over XT-2000 was because

5

HI-STIK was freeze thaw stable, while XT-2000 was not. (Bennett Dep. at 27–28.) Bennett also testified that Inpro did not select HI-STIK based upon the product quality comparisons between XT-2000 and HI-STIK mentioned in defendants' August 21, 2001 letter. For example, Bennett testified that the claim that HI-STIK was three to five times stronger than XT-2000 "had no meaning" to him because "doing . . . in-house testing is more important than seeing numbers that [he] really [didn't] know anything about." (*Id*. at 59–60.) Inpro's president, Steven Ziegler, testified that some of its customers had complained about XT-2000 being frozen upon receipt, so Inpro had to take "significant product back" from them. (Ziegler Dep. at 21.) As Ziegler testified, Inpro "received significant problems with that area to the point where we were not even shipping out [XT-2000] in the winter because of it." (*Id*.) Bennett also testified that customers had complained "that it would be nice to have [the adhesive be] freeze-thaw stable in order for them to get better service, quicker shipments" in the winter months. (Bennett Dep. at 11.) Bennett further testified that Inpro's decision to purchase HI-STIK was influenced by CKD's offer to allow Inpro to privately label the product as "Inpro Bond" so that its customers would identify the adhesive with Inpro. (*Id*. at 34–35.) Bennett testified that he did not recall Super-Tek ever making such an option available to Inpro; however, according to Garuti's testimony, Super-Tek offers private labeling "depending upon the customer request." (Garuti Dep. at 46–47.)

Finally, Inpro's president, Steven Ziegler, testified that, contrary to plaintiffs' allegations, DeSimone never made any disparaging remarks to him about Super-Tek. Super-Tek alleges that Inpro's testimony does not reflect the true reason for the product switch because CKD asked Inpro to write a statement explaining the change to HI-STIK once Super-Tek brought suit against CKD. However, Inpro vice-president for product development, Matthew Bennett, testified that he "came

6

up with the statements" explaining why Inpro switched products. (Bennett Dep. at 79.)

II.     **Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). In drawing inferences in favor of the nonmoving party, "the court is not entitled to weigh the evidence." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000). Nevertheless, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

III.    **Product Disparagement**

The court interprets[2] the plaintiffs' first and third causes of action to allege product

---

[2] Insofar as plaintiffs may have intended to allege wrongful interference with business relations based on solicitation of customers, a cause of action will not lie "unless [the plaintiffs'] customer list could be considered a trade secret, or there was wrongful conduct by the employee . . . such as physically taking or copying files or using confidential information." *Starlight Limousine Service, Inc. v. Cucinella*, 713 N.Y.S.2d 195, 195 (2d Dep't 2000). No references were made to any customer lists in this case; therefore, the court does not presume that this is part of plaintiffs' cause of action.

Moreover, though the plaintiffs mention "unfair competition" in the first and third causes of

7

disparagement, also known as trade libel. *See Gucci Am., Inc., v. Duty Free Apparel, Ltd.,* 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003). Plaintiffs allege that defendants "entered into an unlawful plan, scheme and conspiracy to harm the business and disparage the reputation of Plaintiffs, and specifically Plaintiffs' product XT-2000, and thereby unfairly and unlawfully arrogate to themselves the business and customers of Plaintiffs." (Compl. ¶ 15.) The complaint fails to explicitly name any customers that Super-Tek lost as a result of this "scheme," but it does generally state that, as a result of defendants' alleged misrepresentations, "Plaintiffs' customers ceased or reduced purchases of Plaintiffs' XT-2000, resulting in losses in sales in an amount to date in excess of $300,000." (*Id.* ¶ 19.) Plaintiffs also allege "lost profits," without providing further details or a specified amount. (*Id.* ¶ 29.)

Despite the fact that plaintiffs lost Inpro as a customer, defendants' behavior does not rise to the level required to support a claim of product disparagement. To prevail on a claim of product disparagement, plaintiffs have the burden of establishing: "(1) the falsity of [the] statements; (2) publication to a third person; (3) malice; and (4) special damages." *Gucci*, 277 F. Supp. 2d at 276 (quoting *Kirby v. Wildenstein,* 784 F. Supp. 1112, 1115 (S.D.N.Y. 1992)). "Generally a statement is actionable only where it is made intentionally to a third person and results in direct financial loss to the party whose interest is disparaged." *Richard J. Brignoli v. Balch Hardy & Scheinman, Inc,* 645 F. Supp. 1201, 1208 (S.D.N.Y. 1986) (citing *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.,* 257 N.Y.S.2d 884, 886 (1st Dep't 1965) (citing RESTATEMENT (SECOND) OF TORTS § 630 et seq.)).

---

action, the court distinguishes product disparagement from common law unfair competition. "Common law unfair competition is limited to misrepresenting the origin of goods—so-called 'palming off.'" *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 1992 WL 170559, at *4 (S.D.N.Y. 1992) (quoting *Constr. Tech., Inc. v. Lockformer Co.*, 704 F. Supp. 1212, 1217 (S.D.N.Y. 1989)). In this case, plaintiffs do not allege that defendants attempted to pass off HI-STIK as XT-2000; therefore the court discounts this theory as well.

8

Special damages must be proven in cases of disparagement of a product. *Payrolls*, 257 N.Y.S.2d at 887. There is no cause of action if the special damages are not the "natural and immediate consequence of the disparaging statements." *Kirby*, 784 F. Supp. at 1116 (quoting *Angio-Medical Corp. v. Wli Lilly & Co.,* 720 F. Supp. 269, 274 (S.D.N.Y. 1989)).

Plaintiffs' claims are insufficient with regard to showing causation and damages. Plaintiffs have failed to meet the burden of proving that any allegedly disparaging conduct committed by the defendants was causally related to loss of XT-2000 sales. Inpro explicitly testified that "the key" behind its decision to switch from XT-2000 to HI-STIK was that HI-STIK was freeze thaw stable. (Bennett Dep. at 27.) Bennett stated that being freeze thaw stable was "a feature benefit" and that he was impressed that, after putting the HI-STIK adhesive in the freezer five times, "it seemed like the adhesive got even tackier after it froze and thawed again, which [he] thought was pretty neat." (*Id*. at 28.) The letter that defendants sent to Inpro, which contained allegedly false statements comparing the two adhesives, simply did not influence Inpro's decision to switch suppliers. During his deposition, Bennett testified that he "really didn't look at [the letter saying that HI-STIK was three to five times stronger than XT-2000]" because he "d[i]dn't know what that mean[t]." (*Id*. at 60.) Hence, he "didn't really consider that [statement] at all" and did not rely upon it in making the decision to switch products. (*See id*. at 28, 60.) According to Bennett's testimony, other than HI-STIK being freeze thaw stable, which plaintiffs do not dispute, nothing else in defendants' letter influenced his decision to choose HI-STIK. (*See id*. at 30.) Further, Bennett testified that the only comments from DeSimone about HI-STIK that influenced the decision to switch products were that "it's freeze-thaw stable, and it passed the UL Class A." (*Id*.) Plaintiffs have failed to prove a causal link between the letter and the alleged disparaging remarks made by DeSimone and Inpro's decision

to switch suppliers.

With regard to showing damages, the complaint fails to specify customers who were lost as a result of defendants' behavior. "'If the special damage was a loss of customers . . . the persons who ceased to be customers, or who refused to purchase, must be named . . . . [If] they are not named, no cause of action is stated.'" *Payrolls*, 257 N.Y.S.2d at 887 (quoting *Drug Res. Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 441 (citing *Reporters' Ass'n of Am. v. Sun Printing & Publ'g Ass'n,* 186 N.Y. 437, 442 (1906))). While at least one district court within the Second Circuit "has questioned the wisdom of requiring a plaintiff to name lost customers where the circumstances make it 'virtually impossible to identify those who did not order the plaintiff's product' because of the alleged disparagement," that court still imposed a burden on the plaintiff to sufficiently exclude other causes for the loss. *See Kirby*, 784 F. Supp. at 1117–18 (quoting *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 156 (S.D.N.Y. 1983)). Here, though plaintiffs finally named Inpro as a lost customer in their memorandum in opposition to defendants' motion, plaintiffs have not ruled out the alternative explanation that Inpro chose to switch adhesive suppliers because HI-STIK is, in fact, freeze thaw stable, while XT-2000 is not.

Moreover, plaintiffs have not specified itemized special damages sustained, and approximated damages are insufficient to make out a cause of action in disparagement. *See Proctor & Gamble Co. v. Quality King Distribs., Inc.,* 974 F. Supp. 190, 198–99 (E.D.N.Y. 1997). It is well-settled that when alleging special damages, "[r]ound figures or a general allegation of a dollar amount as special damages do not suffice." *Gucci*, 277 F. Supp. 2d at 277–78 (quoting *Proctor & Gamble*, 974 F. Supp. at 198–99).

For these reasons, the court need not address the issue of any alleged falsity contained within

statements made by defendants. The motion for summary judgment made by defendants on plaintiffs' product disparagement claim is granted.

IV. **Fraud**

Based upon the actual language used in the complaint, plaintiffs' second cause of action is difficult to distinguish from the first. Again, the complaint does not specify an explicit cause of action but instead charges:

> Defendants authored, prepared, published and circulated certain marketing and advertising materials, including correspondence, in which Defendants made false, fraudulent and misleading representations to customers, potential customers and specifically customers of Plaintiffs with the sole intent to harm the business and disparage the reputation of Plaintiffs, and specifically Plaintiffs' product XT-2000, and thereby attempt to unfairly and unlawfully arrogate to themselves the business and customers of Plaintiffs.

(Compl. ¶ 22.)

Assuming that plaintiffs raised a claim of unfair competition by disparagement in the first cause of action, the court interprets this second cause of action as fraud. Under New York law, in order to prove a claim of fraud, the "plaintiff must prove (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with intent to defraud; and (4) reasonable reliance on the *part of the plaintiff*; (5) that causes damage to the *plaintiff*." *Johnson Elec. North Am. v. Mabuchi Motor Am. Corp.*, 98 F. Supp. 2d 480, 488 (S.D.N.Y. 2000) (emphasis added).

Plaintiffs have alleged no facts establishing any of the requisite elements to support a claim of fraud. *Inpro* is the only party that might have reasonably relied upon any allegedly false allegations made by defendants. However, Inpro is not even a party to the action and plaintiffs cannot allege fraud on behalf of Inpro. *See Am. Tissue, Inc. v. Arthur Andersen, L.L.P.*, 275 F. Supp.

2d 398, 404 (S.D.N.Y. 2003) (stating that "a party must 'assert *his own* legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'" (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975))). Plaintiffs' claim must fail because *plaintiffs themselves* did not reasonably rely upon any alleged misrepresentations made by the defendants. *See id.* There is no causal link between defendants' letter or allegedly disparaging remarks and any harm sustained by plaintiffs. Accordingly, defendants' request for summary judgment is granted as to this claim.

**V.    Conclusion**

For the reasons set forth above, defendants' motion for summary judgment is granted in its entirety. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED:   Brooklyn, New York
         September 29, 2005

_____/s/_____
DORA L. IRIZARRY
United States District Judge